# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

OSCAR GARNER,
        Plaintiff,

v.                                                     Case No. 15-C-777

JAMES MUENCHOW, et al.,
        Defendant.

## DECISION AND ORDER

Oscar Garner, a Wisconsin state prisoner who is currently confined at the Wisconsin Secure Program Facility ("WSPF"), filed an action pursuant to 42 U.S.C. § 1983, alleging that, while he was confined at the Waupun Correctional Institution ("WCI"), the defendants violated his rights. Judge Rudolph T. Randa, who was assigned to the case at that time, screened the plaintiff's complaint and allowed him to proceed on claims that the defendants violated his First and Fourteenth Amendment rights. Before me now are the parties' cross-motions for summary judgment.

## I. BACKGROUND

The events giving rise to this suit occurred when the plaintiff was an inmate at WCI. Defendants were Department of Corrections ("DOC") employees who worked as staff members at WCI. From November 19, 2012 to March 18, 2013, the plaintiff was housed in the "restrictive housing unit," which used to be called segregation. Because the parties in their briefs refer to this unit as "segregation," so will I.

The DOC has a written policy pertaining to the acquisition, possession, and use of religious property by inmates. *See* Division of Adult Institutions Policy 309.61.02, ECF No. 52-1. Under that policy, an inmate may acquire and possess various religious

items associated with his or her designated religion. The plaintiff is Muslim, and under the policy he was allowed to possess religious books, prayer beads, prayer oil, a kufi cap, and a prayer rug. While the plaintiff was in segregation, he sought to acquire some of these items, specifically a copy of the Quran,[1] prayer beads, a kufi cap, and a prayer rug. (The plaintiff also wanted to use prayer oil while in segregation, but he either already had some when he was transferred to segregation or was able to acquire some while he was in segregation. The plaintiff has conceded that his claims in this suit do not concern access to prayer oil. See Def. PFOF ¶ 82 (undisputed).)

Under the DOC's policy, an inmate can obtain religious property in a number of ways. He may purchase the property from the institution's canteen (if the canteen carries the item the inmate wishes to acquire), order it from an outside vendor, or receive it from a non-incarcerated individual who sends it to the inmate or orders it on the inmate's behalf. If the inmate wishes to purchase religious property from an outside vendor, and that property is available from one of the DOC's "approved" vendors, the

---

[1] The defendants contend that the plaintiff has conceded that he was able to borrow a copy of the Quran while he was in segregation. They cite paragraph 80 of their proposed findings of fact, which the plaintiff did not specifically dispute. However, in his responses to the defendants' other proposed findings, the plaintiff disputes that he was borrowing a Quran while he was in segregation. See Resp. to Def. PFOF ¶ 75. He also submits a supplemental declaration in which he states that he had a borrowed Quran until he was transferred to segregation, at which time staff at the segregation unit took it from him. Supp. Aff. of Oscar Garner ¶ 17. The defendants contend that I must disregard this affidavit because it contradicts Garner's deposition testimony. However, I conclude that the deposition testimony is consistent with the affidavit. The question Garner was asked at his deposition was whether he had a Quran *before* going to segregation, and Garner answered yes to that question. Garner Dep. at 62:7–62:18. The deposition does not establish that the Quran was not taken from Garner when he arrived at the segregation unit. Thus, for purposes of the defendants' motion for summary judgment, I must assume that Garner did not have a Quran while he was in segregation.

inmate must order the property from an approved vendor. At the time the plaintiff was housed in the segregation unit at WCI, there were two approved vendors: JL Marcus and Union Supply. These vendors sold religious items, along with an assortment of other products, including clothes, hobby materials, and jewelry.

As an alternative to purchasing religious items, an inmate may access them at the prison's chapel, if the chapel has them. The chapel has copies of various religious texts, including the Quran, and inmates may check texts out of the chapel's library. Def. PFOF ¶ 17 (undisputed). If the inmate cannot get to the chapel in person, he may submit a written request to the chapel to check out a religious text. The written request must be made on form DOC-643. Inmates in segregation may borrow religious texts from the chapel by submitting a request on this form. If an inmate in segregation makes a request to borrow a religious text to the chaplain in person, the chaplain would advise the inmate to submit a written request. *Id.* ¶ 18 (undisputed).

To order an item from an approved vendor, whether that item was religious or not, an inmate generally had to obtain a copy of the catalog and then complete an order form. (If the inmate knew the order number for an item he needed, he could order the item without first obtaining the catalog.) During the time that the plaintiff was housed in the segregation unit at WCI, the staff in charge of that unit, defendants Brian Greff, Shane Waller, and Jessie Schneider, implemented an informal practice for distributing vendor catalogs to inmates. (So far as it appears from the record, the prison had no formal policy governing the distribution of catalogs to inmates.) The vendors sent their catalogs to WCI directly, and they were staple bound. Because staples are not allowed in the segregation unit, staff in that unit would remove the staples prior to distributing the

3

catalogs to inmates. Inmates were not allowed to keep copies of the catalogs. Rather, an inmate had to borrow the catalog when he wanted to order something, and had to return the catalog to prison staff when he was finished, so that it could be lent to other inmates. If an inmate wrote in a catalog or removed pages from it, the catalog would be removed from circulation. Catalogs that were written in would be removed from circulation because prison staff did not want the catalogs to become a medium for secret communication among inmates about gang activity, escape plans, and the like. Catalogs that were missing pages would be removed from circulation because, if they remained in circulation, the inmates would complain that the pages containing the items they wanted were missing.

According to the plaintiff, shortly after he arrived in segregation, he wrote to Brian Greff, the manager of the segregation unit, and requested access to the approved vendor catalogs to order religious items. Garner states in his affidavit that he wrote to Greff six times before November 27, 2012 for this purpose, but Greff did not respond. Aff. of Oscar Garner ¶ 3, ECF No. 38. However, the defendants have been unable to locate any written requests to Greff from Garner that are dated earlier than November 27, 2012. In a written request dated November 27, 2012, the plaintiff asked Greff about obtaining toilet paper, complained about not receiving a "snack bag," and asked Greff why he had not responded to Garner's two earlier requests. On November 29, 2012, Greff wrote back to Garner and informed him that he would speak to a correctional officer about the toilet paper and the snack bag. Greff also informed Garner that he had not received any other requests from him. Def. PFOF ¶ 95 (undisputed) & Decl. of Brian Greff Ex. 1003-1, ECF No. 54-1.

4

On December 23, 2012, Garner wrote a request to Greff asking him why he was not responding to his requests. In the December 23 request, Garner stated that he had sent Greff "over 5" requests and had only received one response. Greff Decl. Ex. 1003-2. Greff responded to this request by asking Garner what his prior requests were about. *Id.*

On January 13, 2013, Garner wrote a request to Greff asking him why he was not allowed to receive the JL Marcus and Union Supply catalogs. Greff Decl. Ex. 1003-3. Garner wrote in the request that he wanted the catalogs so that he could order paper and envelopes from whichever catalog had the lowest price. On January 14, Greff wrote back to Garner and told him to write to the sergeant or lieutenant. Greff told him this because the lieutenant and the sergeant are the staff members who are mostly on the floor, interacting and communicating with the inmates daily, and who would have been the staff members who distributed the catalogs to the inmates. Def. PFOF ¶ 99 (undisputed).

On January 14, 2013, Garner wrote written requests to Lieutenant Schneider and Sergeant Waller, in which he asked for the vendor catalogs to order religious items. Garner contends that neither Schneider nor Waller responded to these requests. Garner also states that, on January 15, 2013, he saw Waller while he was making rounds in the segregation unit and asked him about getting the vendor catalogs so he could order religious items. Garner states that Waller told him that the catalogs were only available to inmates on "C range." *Id.* ¶ 30. This would have been a reference to the different "ranges" of the segregation unit. Ranges A and B were more restrictive than Range C. At the time Garner spoke to Waller, he was being housed in Range B.

5

Waller and Schneider have both submitted declarations in which they state that, as far as they know, there was no policy against an inmate on Ranges A or B receiving the vendor catalogs. Although Waller does not remember talking to Garner about the catalogs, he suggests that if he mentioned something about Range C, it was to inform the plaintiff that all of Range B's catalogs had been removed from circulation, but that catalogs were still available in Range C. According to Waller, the inmates on Ranges A and B defaced the catalogs more often than did the inmates on Range C.

On February 2, 2013, Garner wrote another request to Greff concerning the catalogs. In this request, Garner wrote that he had contacted the sergeant and lieutenant about the catalogs but was not provided with them. This time, Garner informed Greff that he wanted to order a prayer rug, envelopes, paper, prayer oil, and prayer beads. On February 3, 2013, Garner wrote a similar request and directed it to WCI's business office. On February 4, 2013, the business office told Garner to contact the institution's chapel. On February 5, 2013, Greff told Garner that he was in the process of creating a makeshift catalog for inmates to use and would get it into circulation soon. Def. PFOF ¶ 104 (undisputed); Greff Dec. Ex. 1003-4. I describe this makeshift catalog in more detail below.

On February 12, 2013, Garner filed a complaint through the DOC's inmate complaint review system. *See* Decl. of James Muenchow Ex. 1005, ECF No. 55-1. Garner complained about not receiving the vendor catalogs to order religious items. James Muenchow was the inmate-complaint examiner assigned to review the complaint. Muenchow recommended dismissing the complaint on the ground that the prison had no obligation to allow inmates housed in segregation to place orders from

6

vendor catalogs. He noted that inmates in segregation could receive religious property through other channels, and that allowing inmates in segregation to place orders from the catalogs would impose an excessive burden on prison staff. *Id.* Muenchow states in his declaration that, in making this determination, he reviewed the prison policies and rules he thought were applicable and determined that the prison staff Garner had complained about did not violate any such policies or rules. *Id.* ¶¶ 6–10. Garner appealed the dismissal of his complaint to WCI's deputy warden, Donald Strahota. On February 22, 2013, Strahota affirmed the dismissal of the complaint. In his declaration, Strahota states that he reviewed the relevant prison policies and determined that Muenchow's interpretation of them was correct. *See* ECF No. 58.

Garner also contends that he asked WCI's chaplain, defendant Francis Paliekara, to assist him in obtaining the religious items he needed. Garner states that, on February 4, 2013, he sent Paliekara a written request for a Quran and also for access to the vendor catalogs, but that Paliekara did not respond to this request. Aff. of Oscar Garner ¶ 26. Garner also states that, on February 9, 2013, while Paliekara was making rounds in the segregation unit, Garner asked him about getting access to the vendor catalogs. *Id.* ¶ 27. According to Garner, Paliekara told him to speak to the "unit manager" (who was Greff) about the catalogs. *Id.* Paliekara does not recall this conversation, and the chapel has been unable to locate Garner's written request for a Quran and the catalogs. Decl. of Francis Paliekara ¶ 23. Paliekara also states that the chapel does not have copies of the vendor catalogs to lend to inmates. *Id.* ¶ 25.

On March 12, 2013, Garner wrote to the institution's psychological services unit. He stated that he was having a hard time, feeling down, and having trouble sleeping.

7

He stated that this was because he was unable to receive the religious items that he needed for prayer and that his faith was slipping. The plaintiff identified the items he needed as prayer beads, a kufi cap, a Quran, and a prayer rug. Garner Aff. Ex. 7, ECF No. 38-1. On the same day, someone from the psychological services unit responded to Garner's request and told him to direct his concerns over his religious property to security staff. This person also advised Garner to use the materials he had received concerning depression and told him that he would be seen by psychological staff in the coming days.

On March 18, 2013, the plaintiff was transferred out of the segregation unit at WCI. The plaintiff states that, on March 26, 2013, he obtained a kufi cap and prayer beads, and that sometime in March 2013 he was able to borrow another Quran. Supp. Garner Aff. ¶ 17.

The defendants do not deny that Garner was not provided with copies of the vendor catalogs while he was in the segregation unit at WCI. However, according to their evidence, this was because copies of the catalogs were not readily available during the several months that Garner was in that unit. Copies were not readily available because the inmates who had previously borrowed them either did not return them or had ruined or defaced them in some way, such as by removing pages or writing in the catalogs.

By the end of 2012, Greff was aware of the catalog shortage, and he decided to personally create a makeshift catalog for distribution to all inmates in the segregation unit. Greff cut out and pasted individual items from the JL Marcus and Union Supply catalogs onto two sheets of paper. The makeshift catalog included items such as paper

8

products, books, footwear, and religious items, which were all allowable items in the segregation unit. Greff distributed copies of the makeshift catalog to all inmates on the segregation unit on March 22, 2013, and each inmate was given a personal copy to keep. By this time, however, the plaintiff had been transferred out of the segregation unit.

Greff does not explain why it took him several months to address the catalog shortage. Presumably, additional copies of the catalogs could have been requested from the vendors themselves, and the vendors would have promptly supplied the prison with additional copies. Or Greff could have created his makeshift catalog sooner.

In his complaint, the plaintiff alleges that, in denying him access to the vendor catalogs for four months, the defendants denied him his right under the First Amendment to freely exercise his religion. He also alleges that the defendants treated Muslim inmates differently than inmates of other religions, in that they allowed inmates of other religions to borrow the catalogs but would refuse to lend them to Muslim inmates. The plaintiff also alleges that the chaplain, Paliekara, substantially burdened his religion and intentionally discriminated against him by failing to respond to his request for a Quran. The parties have filed cross-motions for summary judgment on these claims.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I take evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror

9

Case 2:15-cv-00777-LA    Filed 10/12/16    Page 9 of 18    Document 72

could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

Garner first claims that the defendants, by failing to provide him with a means for acquiring religious property while he was in segregation, deprived him of his rights under the First Amendment's free-exercise clause.[2] Under the free-exercise clause, a prison staff member is liable to an inmate if the defendant "personally and unjustifiably placed a substantial burden on [the inmate's] religious practices." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016). A burden is unjustified if it is not reasonably related to a legitimate penological interest. *Id.* at 380 (citing *Turner v. Safley*, 482 U.S. 78, 89–91 (1987)).

In many free-exercise cases involving prisoners, the prisoner challenges a prison policy or refusal to provide a religious accommodation. *See, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987); *Vinning-El*, 657 F.3d at 592. In the present case, however, the DOC did not have a policy prohibiting inmates in segregation, such as Garner, from acquiring religious property. To the contrary, the DOC's written policy permitted inmates to acquire religious property through various channels, including through the approved vendor catalogs and the prison chapel. Although the written policy did not expressly state that inmates in segregation were entitled to access the

---

[2] Although Garner in his brief references the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), that statute is inapplicable to this case. The conduct Garner challenges is not ongoing, and therefore he may not obtain injunctive relief and is limited to recovering damages. The Seventh Circuit has held that RLUIPA does not create a cause of action for damages against state officials in their individual capacities. *See Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011). Therefore, to obtain damages, Garner may not use RLUIPA and must instead rely on the free-exercise clause and 42 U.S.C. § 1983.

10

vendor catalogs or chapel property, the staff in the segregation unit generally lent catalogs to inmates and allowed them to order property from the catalogs, and the chapel allowed inmates in segregation to borrow religious texts by making written requests.

The reason we are here is that, even though the prison allowed inmates in segregation to purchase religious property and to borrow texts from the chapel library, the plaintiff contends that he was unable to access the catalogs or the chapel library for a four-month period. The lack of such access, in turn, deprived Garner of the religious items he felt that he needed to properly exercise his religion. I will assume for purposes of this motion that Garner's inability, for four months, to either order religious items from the catalogs or borrow them from the chapel substantially burdened his religious practices.

The defendants were, in different respects, personally involved in substantially burdening the plaintiff's religion in this fashion. Greff, Waller, and Schneider were the staff members who distributed the catalogs to inmates in the segregation unit and failed to provide Garner with access to them. Paliekara, the chaplain, failed to respond to the plaintiff's request to borrow a Quran.[3] Muenchow and Strahota rejected the plaintiff's inmate complaint about the lack of access to the vendor catalogs. However, even when the record is viewed in the light most favorable to Garner, there is no evidence that the defendants *intended* to substantially burden the plaintiff's religious practices. That is, there is no evidence that any defendant, knowing that the plaintiff needed to acquire

---

[3] Although the plaintiff alleges that he also asked Paliekara for the vendor catalogs, it is undisputed that Paliekara and the chapel did not have copies of the vendor catalogs to lend to inmates.

11

religious items to properly practice his religion, refused to provide him with a catalog (or, in the case of Paliekara, a Quran) that was readily available. At most, defendants Greff, Waller, and Schneider were negligent in failing to insure that inmates in the segregation unit had adequate access to the vendor catalogs, defendant Paliekara was negligent in failing to insure that the chapel responded to the plaintiff's request for a Quran, and defendants Muenchow and Strahota were negligent in concluding that inmates in the segregation unit were not allowed to order items from the vendor catalogs when, in fact, staff members in the segregation unit had an informal practice of lending catalogs to inmates.

Garner has not cited, and I have been unable to find, any cases holding a prison staff member personally liable for negligently or unintentionally causing a substantial burden on an inmate's religious practices. Rather, the only binding case that I have found involved prison staff members who intentionally imposed a substantial burden on an inmate's religious practices. *See Thompson*, 809 F.3d at 380 (holding staff members liable for damages under § 1983 because they were "personally involved in intentionally denying" an inmate meal bags that he needed to properly practice Ramadan). I also have been unable to find cases holding that an inmate has a First Amendment right to acquire religious property while being housed in a segregation unit. Assuming for the sake of argument that an inmate has such a right, no case holds that prison staff members must exercise reasonable care to insure that channels for acquiring religious property remain open to inmates.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or

12

constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Here, as noted, there is no clearly established law providing that a prison staff member is personally liable for negligently, rather than intentionally, depriving an inmate of his free-exercise rights under the First Amendment. Moreover, there is no clearly established law providing that the free-exercise clause of the First Amendment requires prison staff members to exercise reasonable care to insure that an inmate in segregation has adequate access to channels for acquiring religious property. Thus, reasonable persons in the positions of the defendants would not have known that their actions—or, more accurately, their failure to take certain actions—would result in a violation of the plaintiff's rights. Accordingly, the defendants are entitled to qualified immunity in connection with the plaintiff's substantial-burden claim.

In addition to claiming that the defendants substantially burdened his religious practices, Garner contends that they intentionally made it more difficult for Muslim inmates to acquire religious property than inmates who practiced other religions. If this allegation of intentional religious discrimination were true, the defendants would not be entitled to qualified immunity, as it is clearly established that state officials generally may not favor one religion over another. *See, e.g., Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013). However, as explained below, Garner has not pointed to evidence from which a jury could reasonably infer that any defendant intentionally discriminated against Muslims.

Garner does not have evidence that the correctional officers assigned to the segregation unit (*i.e.,* defendants Greff, Schneider, and Waller) or the chaplain

13

(Paliekara) made any statements suggesting that they harbored discriminatory feelings towards Muslims.[4] Instead, he submits affidavits from four other inmates in which the inmates describe their experiences in attempting to obtain the vendor catalogs and certain religious texts while they were housed at WCI.[5] The plaintiff's goal in submitting these affidavits is to show that Muslim inmates were denied access to the catalogs and to copies of the Quran, while Christian inmates were granted access to the catalogs and were able to borrow Bibles from the chapel library. Two inmates, Zachary Hayes and Gregory White, state in their affidavits that they are Christian, that they were able to borrow Bibles from Paliekara, and that they were able to order Bibles out of the approved vendor catalogs while they were housed on Range B of WCI's segregation unit. A third inmate, Darryl Salters, states that while he was housed in the segregation unit at WCI (which was in January 2010, about three years before the events giving rise to this suit), he was able to borrow a Bible from Paliekara. Salters does not state that he was able to obtain the vendor catalogs. The fourth inmate, Jeremy Clark, states that "at times" when he was confined on Range B of the segregation unit at WCI in 2012, he

---

[4] It is not clear whether the plaintiff claims that defendants Muenchow and Strahota, who reviewed the plaintiff's inmate complaint concerning access to religious property, discriminated against Muslims. However, there is no evidence in the record suggesting that these defendants acted with discriminatory intent, and therefore they would be entitled to summary judgment on any discrimination claims.

[5] The plaintiff also submits an inmate complaint filed by Terrance Prude, another inmate who was housed in the segregation unit at the same time as the plaintiff, in which Prude alleges that he is Muslim and was unable to obtain copies of the vendor catalogs to order Muslim religious items. However, the inmate complaint contains out-of-court statements by Prude, and Garner is offering these statements for the truth of the matters asserted, *i.e.,* that Prude is Muslim and was unable to obtain the vendor catalogs. Therefore, the complaint is inadmissible as hearsay, and I will not consider it. *See* Fed. R. Evid. 801, 802.

14

was unable to obtain the vendor catalogs to order Muslim religious items. Aff. of Jeremy Clark ¶ 3.

With respect to the vendor catalogs, the affidavits of Garner, Hayes, White, and Clark do not give rise to a reasonable inference that the defendants intentionally denied Muslims access to the catalogs but granted access to Christians. To begin with, Hayes, White, and Clark do not identify the staff members who either provided them with access to the catalogs or denied them such access, and thus a jury could not reasonably infer that the defendants in this case were personally involved in those decisions. Moreover, Hayes, White, and Clark do not include any facts in their affidavits suggesting that the staff members they dealt with either knew their religious affiliations or knew that they were requesting the catalogs to order religious items rather than nonreligious items. Thus, the affidavits do not suggest that prison staff took the inmate's religion into account when deciding whether to allow him to borrow a catalog. Rather, the affidavits merely establish that some inmates were able to obtain the catalogs at certain times, while other inmates were unable to obtain the catalogs at other times. Indeed, Clark, who is Muslim, states that he was unable to obtain the catalogs "at times," which implies that he was able to obtain the catalogs at other times. Garner does not dispute that there was a shortage of catalogs in the segregation unit in late 2012 and early 2013. *See* Def. PFOF ¶¶ 58, 62–63. Thus, the only reasonable inference to be drawn from the evidence in the record is that the scarcity of catalogs resulted in the inmates having spotty access to them. Given this spotty access, the evidence that two Christian inmates (Hayes and White) were able to obtain the catalogs to order Bibles, that one Muslim inmate (Clark) was able to obtain the catalogs at times

15

Case 2:15-cv-00777-LA   Filed 10/12/16   Page 15 of 18   Document 72

and unable to obtain them at other times, and that another Muslim inmate (Garner) was unable to obtain the catalogs at all, does not give rise to a reasonable inference that staff in the segregation unit at WCI intentionally used religion as a factor when determining who would receive the catalogs.

A separate question is whether the evidence shows that Paliekara refused to lend Qurans to Muslims but would lend Bibles to Christians. Recall that, according to Garner, he made a written request to borrow a Quran from the chapel library, and that Paliekara did not respond to this request. Garner contends that he did not receive a response because he is Muslim, and he seeks to prove that Paliekara is biased against Muslims by pointing out that Paliekara lent Bibles to Salters, Hayes, and White. White also states in his affidavit that, on more than one occasion, he observed Paliekara refuse to provide a Quran to a Muslim inmate.

However, this evidence does not give rise to a reasonable inference that Paliekara is biased against Muslims. Garner does not dispute that the appropriate way to request a religious text from the chapel is to make a written request on form DOC-643, rather than to make an oral request to Paliekara while he is making rounds. *See* Def. PFOF ¶ 18 (undisputed). The Christian inmates who obtained Bibles do not explain how they made their requests, and thus it may be that they made appropriate written requests, rather than improper oral requests. Although White states that he observed Paliekara refuse to provide Qurans to Muslims, he does not explain the facts surrounding the incidents he observed, and therefore these may have been incidents in which an inmate asked Paliekara for a Quran during rounds and Paliekara told the inmate that he would need to submit a written request. Thus, the testimony of Salters,

16

Hayes, and White does not give rise to a reasonable inference that Paliekara intentionally discriminated against Muslims when lending religious texts. Rather, their testimony is consistent with Paliekara's testimony, which is that he would not act on oral requests for religious texts that inmates made during his rounds but rather would require inmates to make written requests on form DOC-643.

It is true that, construing the evidence in the light most favorable to Garner, it appears that Garner did make a written request but did not receive a response from Paliekara. However, the fact that Paliekara failed to respond to a single written request for a Quran does not, by itself, give rise to a reasonable inference that Paliekara was biased against Muslims. This is especially true in light of the fact that Paliekara does not personally process the written requests for religious texts. Rather, "inmate clerks" in the chapel process those requests. *See* Def. PFOF ¶ 19 (undisputed).

For these reasons, the defendants are entitled to summary judgment on the plaintiff's claim that they treated Muslims differently than inmates of other religions with respect to access to vendor catalogs and religious texts.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the plaintiff's partial motion for summary judgment (ECF No. 36) is **DENIED** and the defendants' motion for summary judgment (ECF No. 49) is **GRANTED**. The Clerk of Court shall enter final judgment.

This order and the judgment to follow are final. A dissatisfied party may appeal this decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. I may extend this deadline if a party timely requests an extension and

shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask me to alter or amend my judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. I cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. I cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

I expect parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin, this 12th day of October, 2016.

                                                        s/ Lynn Adelman
                                                        _____
                                                        LYNN ADELMAN
                                                        District Judge